*419] *cells, to pay a fine of 1000 dollars, whereof three-fourth parts to be for the use of Carmalt, and give security for his good behaviour for seven years, himself in 500l. and two sufficient sureties in 250l. each, and pay costs.

Hook was imprisoned for three months, fined one dollar, and to pay the costs of prosecution.

Cited in 6 S. & R., 225, where it was decided that an indictment for an assault and battery with intent to kill, is not vitiated by stating that the defendant did bite or cut off the ear, etc., the assault and battery with intent to kill being the offense which is punishable, and the injury inflicted merely a circumstance of aggravation.

# Respublica *against* Daniel Montgomery, esq.

Information will lie against a justice of the peace for not actively assisting in suppressing a riot. It is the duty of every citizen to endeavour to suppress a riot, and when the rioters are engaged in treasonable practices, the law protects other persons in repelling them by force.

A RULE had been granted on the defendant, a justice of the peace of Northumberland county, to shew cause why an information should not be filed against him for misdemeanor in office, founded on the affidavits of William Wilson and John M'Pherson, esquires, two of the judges of the Court of Common Pleas of the said county. The substance of these affidavits was as follows:

After the militia had marched from Philadelphia, to suppress the insurrection in the western counties of the state, on the 30th September 1794, the deponents hearing that some ill disposed persons were about to erect a liberty pole (falsely so called) in the town of Northumberland, determined to prevent it if possible. They called on Mr. Montgomery, and desired him to go with them for that purpose; he answered, "the "people were determined to have their grievances redressed, "and would erect the pole; and for his part he would put to "his shoulder to lift or pull at the rope, if required by the "people." He however went reluctantly with them to where the rioters were assembled, but rendered them no assistance in preserving the peace, and shortly after disappeared. An affray took place between one of the rioters and a friend to good order, and some blows passed. Mr. Wilson read what he called the riot act, to induce the multitude to disperse, but they refused. One of them presented a musket at him, and he presented his pistol also. On the 15th of November following Wilson was arrested under two warrants, issued by Montgomery, for supposed assaults, while he was exerting himself to suppress the riot and prevent the erection of the pole. Being brought before the justice, he alleged that what he had done was in the prosecution of his duty, and therefore declined giving bail, and offered to go to gaol. After some

[Respublica *v.* Montgomery.]

altercation he was dismissed, Montgomery saying, things must remain as they were.

Cause was now shewn by Mr. Moses Levy, who produced the *affidavit of Flavel Rowan, esq. late sheriff of Northumberland county, tending to prove, that the [*420 defendant appeared to concur with Wilson and M'Pherson, as to the suppression of the riot, except as to reading of the riot act, and seemed desirous of preserving the peace. He also read the affidavit of the defendant himself, that William Hoffman and William Cool had severally complained of assaults committed by Mr. Wilson on them on the 30th September, and that he had declined issuing process thereon at first, but at length issued his warrants and discharged Wilson on his being brought before him. He annexed thereto the depositions of Hoffman and Cool: the former swore, that Wilson presented a pistol at him; the latter, that Wilson forcibly seized him, while Jasper Ewing, esq. the prothonotary of the county, snapped or attempted to snap a pistol against him. These depositions were taken on the 15th November 1794.

It was urged, that though under the 10th section of the 9th article of the state constitution, informations would lie for oppression and misdemeanors in office, yet the court would exercise their leave of procedure in this way warily and cautiously. The law should not be strained, unless the proofs were clear. Informations would not be granted in England for errors in judgment, or for irregularity, where the heart and intention were pure. 1 Burr. 556. 2 Burr. 722, 1162. Every citizen had a right "to the free communication of his "thoughts and opinions" while his views were upright; and it was difficult to draw the line, when "the abuse of that "liberty" should be said to begin, and the first tinge of criminality appear. It was essential to the freedom of a republic, that people should speak their minds on laws and all public transactions, and their conduct in this particular should not be scanned too nicely. The mere erection of a liberty pole was innocent in itself; and while the minds of the multitude were bent in that direction, the defendant might perceive the inutility as well as danger of opposing their avowed purpose. He might feel his nerves not sufficiently strong to oppose the torrent; and under an imperious necessity might possibly have said, he would assist the people in their darling object, if required. His judgment was imposed on; he did not foresee the dangers of those erections, which public events have since developed; but he is not to be punished for want of foresight.

As to the defendant issuing his warrants against Mr. Wilson, he did no more than his duty. He was not present when all the violences took place on the 30th September. The complainants were sworn to the truth of the charges and re-

[Respublica *v.* Montgomery.]

*421] quired process; *he could not refuse it in the line of his office. What right had any one to snap a pistol against a peaceable man?. What right had any judge to hold him at this period of danger?

*Per cur.* It is the duty of every good citizen to endeavour to suppress a riot; and when he finds a mistaken multitude engaged in treasonable practices, to the subversion of all peace and good order, he is protected by law in coming forward with other well disposed characters, to repel them by force.

Mr. Thomas *è contra*, on the part of the state. The proofs are here sufficiently clear to warrant an information. Though freedom of speech is secured to us by the constitution, yet we are responsible for an abuse of that liberty. The people may meet and discourse on public measures, and the public mind may thus be illustrated and informed; but if they meet for seditious purposes, or when met, go into seditious resolutions, they are amenable to the law. Credulity itself could not be brought to believe, that the defendant, a justice of the peace, was ignorant of the transactions in the western counties, or of the traitorous insurrections existing there, so far back as the month of July. The resolves of Pittsburgh, Parkinson's ferry, and Braddock's fields, had been published; the proclamations of the president of the United States; his mission, and that of the governor of this commonwealth, to the insurgents; the state laws passed on the alarming occasion; and the actual march of the militia, were universally known. Could the defendant be so unconscious of his duty, as not to feel that his oath of office required of him his honest endeavours to preserve the peace, suppress riots, and prevent the erection of liberty poles, "the avowed standards of rebellion?" Has he rendered his assistance in support of good order? It is not pretended by his own affidavit, which is silent as to several of the charges adduced against him. If his conduct arose from weak nerves, or an imperious necessity, he would fairly have declared so upon oath; but his expressions shew that his errors were not confined to his head; they reached his heart; and, at the time of the riot, he could not have been considered as even a neutral character. As to issuing his warrants, it more probably arose from a desire to screen the rioters or himself, and deter prosecutions, than a sense of duty and the advancement of public justice. He could not but know, that Mr. Wilson's efforts were in support of the laws and good government; and though the supposed assaults happened on the 30th September, yet no prosecutions are originated until the 15th November following.

*422] *By the court. We are not now trying the defendant, but examining whether there are reasonable grounds to put him on his trial, and we are unanimously of

[Respublica *v.* Montgomery.]

opinion that there are such grounds. No one can doubt, that the expressions used to the associate judges of the Common Pleas, were highly criminal. The setting up of a pole at any time, in a tumultous manner, with arms, is a riot; but such as erection, when the army were known to have been on their march in support of the constitution and the laws, could only be attributed to an avowed design of giving aid to the insurgents, and intimidating the executives of government. It is the duty of a justice of the peace to suppress a riot, and if he finds persons riotously assembled, he may not only arrest the offenders and bind them to their good behaviour or imprison them, if they do not offer good bail, but he may authorize others to arrest them by a bare verbal command, without other warrants. 1 Hawk. 160. The law requires in such cases an active conduct from justices of the peace; and if they had more generally exercised their due powers in the western counties, the insurrection would have been quelled in the beginning, and how much honour as well as expence saved to the United States. It does not appear before us at present that the defendant did his duty, as a conservator of the peace; on the 30th September, and we are compelled to observe, that his delaying to issue warrants until the 15th November, when his mind must necessarily have been informed more fully, as well of the public proceedings as of the transactions in Northumberland on the previous period, wears a very singular appearance. We would not wish to go further, lest we should prejudice the defendant on his trial, which we are desirous of avoiding. The rule for granting an information must be made absolute.

The defendant entered into a recognizance of 500 dollars, to answer the information.

